The order below is hereby signed.

Signed: December 30 2022



_____
Elizabeth L. Gunn
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| In re: | **Case No. 17-00258-ELG** |
| **Core Communications, Inc.,**<br>**Debtor.** | **Chapter 11** |
| **MCI Communications Services, LLC, and**<br>**Verizon Select Services, Inc.,**<br>**Plaintiffs/Counterclaim-Defendants,**<br><br>**v.**<br><br>**Core Communications, Inc.,**<br>**Defendant/Counterclaim-Plaintiff.** | **Adv. Pro. 19-10003** |

## <u>MEMORANDUM OPINION AND ORDER ON MOTIONS TO COMPEL</u>

On May 11, 2021, the Court issued an oral ruling on cross motions to compel discovery filed by the Debtor/Defendant/Counterclaim-Plaintiff Core Communications, Inc. ("Core") and the Plaintiff/Counterclaim-Defendants MCI Communications Services, LLC,[1] and Verizon Select Services, Inc. (collectively, "Verizon"). At the hearing on April 21, 2021, the parties agreed that Verizon's requests for production 6, 13–18, 20, and 29; and Core's motion to compel Verizon to

---

[1] MCI Communications Services LLC was substituted as a party in July 2020 as the successor entity to MCI Communications Services, Inc. ECF No. 54.

produce a privilege log were resolved. The Court granted the remaining requests, subject to certain limitations not relevant herein, as memorialized in its order signed May 25, 2021[2] (the "May Order"). Order on Mots. to Compel, ECF No. 82. On June 4, 2021, Verizon filed its *Motion for Reconsideration, Vacatur, and Stay of Order on Motions to Compel* (the "Motion for Reconsideration") asking the Court to reconsider or vacate the May Order, or in the alternative, issue a written memorandum as to the May 2021 ruling, and in either case stay the obligation to comply with the May Order pending resolution of the motion. Mot. to Recons., ECF No. 85. The Court granted the requested stay by consent of the parties, and the Motion for Reconsideration is otherwise fully briefed and ready for disposition. *See* Order Granting Mot. for Stay of Order on Mots. to Compel, ECF No. 87 (the "Stay Order"); Opp'n to Mot. for Recon., Vacatur & Stay, ECF No. 89; Reply in Supp. of Mot. for Recon., Vacatur, & Stay of Order on Mots. to Compel, ECF No. 90. However, since the filing of the Motion for Reconsideration and entry of the stay order, Verizon has filed three (3) notices of supplemental authority consisting of over 150 pages of information from other pending litigation between the parties. *See* Notice of Suppl. Auth., ECF No. 93; Notice of Suppl. Auth., ECF No. 94; Notice of Suppl. Auth., ECF No. 95. While the Court acknowledges the filing of the supplemental authority, the authority was not part of the record when this matter was heard and is not relied upon in this Memorandum Opinion. Therefore, upon a review of the record, and for the reasons set forth herein, the Court grants in part and denies in part the Motion for Reconsideration, grants in part and denies in part the Motion to Compel, and modifies the May Order consistent with the findings herein.

---

[2] There was a scrivener's error in the Court's Order on Motions to Compel (ECF No. 82), which listed the resolved requests for production at 6, 13–18, 29 and 20, the correct numbers are included herein. Tr. 68:11–19 (Apr. 30, 2021), ECF No. 77.

# I.    Background

### a.    Procedural History

This case is one in a long line of litigation in the courts, the Federal Communications Commission, and state regulatory authorities between Core and Verizon regarding tariffed telecommunications services and billing related thereto. This case began not with a complaint filed in this Court, but instead in 2014 as part of multiple lawsuits filed by Verizon against Local Exchange Carriers, including Core, in district courts across the country, all of which were transferred to the District Court for the Northern District of Texas for inclusion in the multi-district litigation case *In re IntraMTA Switched Access Charges Litigation* (the "MDL"). MDL No. 2587, Civil Action No. 3:14-MD-2587-D (N.D. Tex. Jan. 6, 2015). Within the MDL, Core filed counterclaims against Verizon in 2016, which are the claims pending before this Court (the "Complaint").[3] As evidenced by the name, the MDL Litigation involved the issue of intraMTA (intra major trading area) switched access charges, where the causes of action in the Complaint arise from non-intraMTA, tariff-based claims. As such, the counterclaims are unrelated to the MDL and were not resolved as part of the resolution of the main case in the MDL.

The counterclaims were initially stayed by the MDL, and during that time on May 2, 2017 Core filed a voluntary chapter 11 petition in the District of Columbia.[4] Subsequently, in October 2018, Core moved in the MDL for the severance and remand of the Complaint to the court of

---

[3] Countercls. by Def. Core Commc'ns, Inc. Against Pls. MCI Commc'ns Servs., Inc. & Verizon Select Servs. Inc., ECF No. 17 [hereinafter Complaint].

[4] This Case was originally filed as a chapter 7 but was converted on May 3, 2017 to chapter 11. *See* Case No. 17-00258-ELG, Order Treating the Case as Converted to Chapter 11, ECF No. 6. ("ORDER TREATING CASE AS CONVERTED TO CHAPTER 11 The amended petition (treating the case as a chapter 11 case) was filed the morning after the afternoon of the filing of the original petition under chapter 7. The chapter 7 trustee would undoubtedly not have begun investigating this case beforehand. It is ORDERED that this case shall proceed as a case converted from chapter 7 to chapter 11, without prejudice to the chapter 7 trustee's seeking on appropriate grounds to vacate this order. Minute Order: (Re: Related Document(s)2 Amended Voluntary Petition.)").

original jurisdiction, which then lifted the stay and transferred the Complaint to this Court initiating

this adversary proceeding. Once this matter was remanded to this Court, on October 21, 2019, the

Court entered an initial scheduling order setting discovery and other pre-trial deadlines. Sched.

Order, ECF No. 36. The initial discovery deadline was May 8, 2020. *Id*. at 2.

 The original counterclaim Complaint included six causes of action asserting multiple

theories of recovery seeking to recover compensation for services Core allegedly provided to

Verizon. Complaint, ECF No. 17. On October 21, 2019, the Court entered a *Consent Order*

*Granting Motion for Leave to Amend Counterclaims*, which deemed filed the amended

counterclaim Complaint filed with the motion for leave and redocketed on October 22, 2019 with

exhibits at ECF number 38. Consent Order Granting Mot. for Leave Am. Countercls., ECF No.

37. On November 1, 2019, Verizon filed a *Motion to Dismiss the Counterclaims*, which was fully

briefed. *See* Mot. Dismiss Am. Countercls., ECF No. 40; Core Commc'ns Inc.'s Opp'n to Dismiss

Am. Countercls., ECF No. 41; Reply Mem. of P. & A. in Supp. of Mot. Dismiss Am. Countercls.,

ECF No. 42. On March 12, 2020, this Court entered its *Memorandum Decision and Order Re*

*Motion to Dismiss Amended Counterclaims* (the "Memorandum Opinion") which dismissed

Counts III, IV, V, and the portion of Count VI related to those Counts.[5] ECF No. 51. However,

because Core offered no rebuttal to Verizon's argument that the filed-rate doctrine barred the

contract claims, the Court noted: "Theoretically, Core might file a motion in which it shows (based

on, for example, a change in the law or facts not yet disclosed) that justice requires that it be

allowed to amend Counts [III, IV, and V]." *Id*. at 11. Because of that possibility, the Court

dismissed the claims for equitable relief without prejudice. *Id*.

---

[5] This case was previously heard by the Honorable S. Martin Teel, Jr. until being reassigned in September 2020.

Judge Teel did not dismiss Counts I and II alleging that Verizon breached the terms of Core's federal and state tariffs and the portion of Count VI seeking declaratory relief as a result thereof. *Id*. at 15. In evaluating the breach of tariff claims, Judge Teel summarized the elements of a breach of tariff claim as "(1) that the LEC operated under a filed tariff; (2) that the LEC provided services to a customer under that tariff; and (3) that the LEC billed the customer for services under its tariffs at rates listed in those same tariffs" with citation to *Advamtel, LLC v. AT&T Corp.*, 118 F.Supp.2d 680, 683–84 (E.D. Va. 2000). *Id*. at 4. After extensive research, it appears that the Court's Memorandum Opinion is the only case that states as a three-part test the standard to collect under a tariff or to analyze whether there is a breach of the terms of the tariff. The test is almost uniformly defined using only elements 1 and 2 as set forth in the Memorandum Opinion. *Advamtel, LLC*, 118 F.Supp.2d at 683; *see also Frontier Commc'ns of Mt. Pulaski, Inc. v. AT&T Corp.*, 957 F.Supp. 170, 175–76 (C.D. Ill. 1997). The final element (element 3) identified by the Memorandum Opinion appears to incorporate the filed-rate doctrine applicable to tariff based claims/cases into the standard to collect under a tariff. The filed-rate doctrine "forbids a regulated entity from [charging rates] for its services other than those properly filed with the appropriate . . . regulatory authority." *Arkansas La. Gas Co.*, 453 U.S. 571, 577 (1981). There is extensive case law interpreting and applying the filed-rate doctrine, which the Court must apply in this case in conjunction with the established 2-element test for breach of tariff.

### b.    *The Motions to Compel*

The remaining counts of the Amended Complaint allege that Verizon breached Core's federal and state tariffs by failing to make payments to Core for interstate and intrastate access services. *See* Am. Compl. at 13–18, ECF No. 11. Due to the non-payment, Core also alleges that Verizon owes not only the unpaid charges but also late payment charges, and must reimburse Core

fees, expenses, and costs related to enforcing the alleged breaches. *Id*. at 19. Count VI of the Complaint requests that the Court enter a declaratory judgment ordering Verizon to timely pay Core for charges under the tariffs as they become due. *Id*. at 15. Verizon denies and/or contests each of the remaining causes of action in the Amended Complaint. *See* Answer to Countercl., ECF No. 18.

In April 2020, Verizon served discovery on Core including requests for production of documents and written interrogatories. In June 2020, Core served discovery on Verizon including requests for production of documents and written interrogatories. Over the course of the remainder of 2020, the parties met and conferred multiple times, leading to the resolution of a significant number of objections and disputes arising from the discovery requests. However, by early 2021, the parties had reached an impasse on several issues, and on January 5, 2021, Verizon filed its *Motion to Compel Discovery* (ECF No. 62) (the "Verizon Motion to Compel")[6] and on February 12, 2021, Core filed its *Motion to Compel Discovery* (ECF No. 68) (the "Core Motion to Compel," collectively with the Verizon Motion to Compel, the "Motions to Compel"). The Verizon Motion to Compel sought an order compelling Core to produce documents and provide complete responses to Verizon's interrogatory numbers 1, 3, 18, and 21 and requests for production 6, 13–18, 20, and 21. Verizon Mot. to Compel, ECF No. 62. The Core Motion to Compel sought an order compelling Verizon to produce documents and provide responses to Core's interrogatory numbers 11, 12, 13, 16, 20, 21, 22, and 23, requests for production 1, 6, 7, 19, and 20, and to provide a privilege log for discovery. Core Mot. to Compel, ECF No. 68. At the April 21, 2021 hearing on the Motions to

---

[6] Verizon's Opposition to the Core Motion to Compel includes as exhibits a Declaration of Stephania Astor in support of its claims as to Core's 8YY traffic (*Opp'n to Core Comm'ncs Mot. Compel Disco.*, Ex. A, ECF No. 70–1) and the declaration of Traci Morgan regarding specific billing analysis (*Opp'n to Core Comm'ncs Mot. Compel Disco.*, Ex. B, ECF No. 70–2).

Compel, the parties agreed that the Motions to Compel were either resolved consensually, a decision deferred, and/or the request withdrawn without prejudice as to Verizon's Motion to Compel requests for production 6, 13–18, 20, and 21 and Core's Motion to Compel a privilege log. *See* Order on Mots. to Compel, ECF No. 82.

The remaining items requiring court determination in the Verizon Motion to Compel were interrogatory numbers 1, 3, 18, and 21. Interrogatory numbers 1 and 3 were partially answered by Core and are described by Verizon as intended to identify the "services Core claims to have provided to Verizon and what equipment it used to provide those services." Verizon Mot. to Compel at 7–8, ECF No. 62. Interrogatory numbers 18 and 21 are described by Verizon as intended to obtain information related to charges billed to Verizon for which Verizon alleges that Core has admitted the work was performed by other companies. *Id*. at 13. As set forth in the Court's oral ruling on May 11, 2021 and as stated in the May Order, the Court granted Verizon's Motion to Compel and ordered Core to provide complete responses within 30 days after entry of the order. Order on Mots. to Compel, ECF No. 82. That portion of the May Order is not subject to the Motion for Reconsideration, however, the obligation to comply with the May Order was stayed pending resolution thereof. Order Granting Mot. for Stay of Order on Mots. to Compel, ECF No. 87.

The remaining items at issue for the Court to determine from Core's Motion to Compel are Core's interrogatory numbers 11, 12, 13, 16, 20, 21, 22, and 23 and requests for production 1, 6, 7, 19, and 20. In the Core Motion to Compel, the outstanding discovery requests are grouped into four different categories: (i) interrogatory numbers 11, 12, 13 and request for production 7—volume of traffic Verizon received from Core and delivered to its customers and payments received from customers; (ii) interrogatory number 16 and requests for production 19 and 20—traffic delivered by Core to Verizon via a third-party intermediate carrier; (iii) interrogatory numbers 20,

21, 22, and 23—complaints over allegedly fraudulent traffic received from Core and delivered to Verizon customers; and (iv) requests for production 1 (requesting traffic studies) and 6 (call detail records since 2011)—requests that were not subject to objection but for which no documents had been produced. Core Mot. to Compel, ECF No. 68. This issue is whether such requests are relevant to the issues in this case, and if so, if there is any other reason why the Court should not order responses.

In support of Core's argument as to the relevance of the at-issue discovery, Core references the November 2020 *Expert Report of Leslie Saint on Behalf of MCI Communications Services LLC and Verizon Select Services Inc.* (the "Saint Report") produced by Verizon, a copy of which was attached to Core's Motion to Compel as Exhibit A. ECF 68–3. As set forth in the Saint Report, the expert, Ms. Saint, is a 24-year employee of Verizon and a manager in the Invoice Validation Department. She is not a lawyer but has served as a fact or corporate witness on behalf of Verizon in multiple matters. *Id.* at ¶ 4. At issue with respect to the Core Motion to Compel, the Saint Report identifies three categories of calls originating from Core that Verizon contends are not compensable. *Id.* at ¶ 7. One such identified category is described as "traffic that was the product of *fraud* or illegal activity, including auto-dialed 8YY traffic" or "calls that are *fraudulent* or the product of illegal activity (including auto-dialed 8YY calls)." *Id.* (emphasis added).

Despite the dismissal of the equitable claims in the case, Core argues that the use of the terms "fraud" and "fraudulent" by Ms. Saint widens the scope of relevant discovery to include elements of legal fraud and/or defenses thereto. Verizon argues that Ms. Saint's use of the terms fraud and fraudulent were not in the "legal" sense, but instead an industry shorthand for automatically dialed calls and robocalls. Hr'g Tr. at 47:9–10, Apr. 21, 2021, ECF No. 77. Upon a review of both the Saint Report, Core's rebuttal expert report, applicable caselaw, and other official

publications of the Federal Communications Commission, the Court finds that the terms fraud and fraudulent are utilized in the telecommunications industry as a term of art that is different from a standard "legal" or common law definition of fraud. With this limitation as to the term "fraud" to the telecommunications term of art, the Court will address the remaining interrogatories and requests for production at issue.

## II.    Legal Standard

As an initial matter, Verizon styled its motion as a *Motion for Reconsideration, Vacatur, and Stay of Order on Motions to Compel*. ECF No. 85. However, the relief requested in the Motion for Reconsideration was in the alternative—either for reconsideration of the order on the Motions to Compel or for the issuance of a written opinion on the Motions to Compel. *Id.* at 2. The parties' briefs on the Motion to Reconsider clearly establish the standard for this Court's reconsideration of a prior ruling pursuant to Federal Rule of Civil Procedure ("Civil Rule") 59(e) in this District. The Court does not reach the question of whether the standard for reconsideration is met, because in preparation of this written opinion, the Court has determined that certain portions of the initial ruling on the Motions to Compel were based, at least in part, upon an incorrect application of the term fraud within the context of this telecommunications dispute. Further, upon additional consideration of the Memorandum Decision on the Motion to Dismiss, the Court issues this ruling based upon a revised interpretation of law as to the dismissal of the equitable claims. Therefore, this written opinion is issued on the Merits of the Core Motion to Compel as if this were the initial order or written opinion after the hearing thereon based upon the merits of Civil Rule 26(b)(1).[7]

---

[7] Civil Rule 26(b)(1) is made applicable here through Federal Rule of Bankruptcy Procedure 7026 (the "Bankruptcy Rules," and each individually a "Bankruptcy Rule"), for clarity reference will be made directly to the Civil Rule.

Civil Rule 26(b)(1) permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevance to a party's claim or defense is construed broadly. *See CFTC v. McGraw-Hill Cos.*, 390 F.Supp.2d 27, 31 (D.D.C. 2005). "[A] party may discover information . . . if such information will have some probable effect on the organization and presentation of the moving party's case." *Cartagena v. Centerpoint Nine, Inc.*, 303 F.R.D. 109, 112 (D.D.C. 2014) (quoting *Smith v. Schlesinger*, 513 F.2d 462, 473 (D.C. Cir. 1975)). The requested information must pertain to "the nature of the claims that the parties have asserted." *Cobell v. Norton*, 226 F.R.D. 67, 79 (D.D.C. 2005). "Courts test relevance by looking at the law and facts of the case, not simply the expressed desires of a party to see certain information." *United States v. Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. 22, 36 (D.D.C. 2012) (citation omitted). There is a limit to relevancy, and courts may deny a motion to compel when the request seeks discovery of information with "no conceivable bearing on the case." *Burlington Ins. Co. V. Okie Dokie, Inc.*, 368 F.Supp.2d 83, 86 (D.D.C. 2005) (quoting *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984)).

In considering whether a request is proportional to the needs of the case, the Court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). More succinctly stated, the court must weigh the importance and relevance of the requested materials against the burden of compliance. *Id.* The goal is not to create the most efficient exchange of information, only to discourage "fishing expeditions, discovery abuse, and inordinate expense involved in overbroad and far-ranging discovery requests." *Kellogg Brown & Root Servs., Inc.*, 284 F.R.D. at 37 (quoting *Hardrick v.*

*Legal Servs. Corp.*, 96 F.R.D. 617 (D.D.C. 1983)). A request may be overly burdensome if it directs the party to create documents that do not exist. *See, e.g.*, *Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012). To show that a discovery request is unduly burdensome, a party must proffer evidence that shows "the nature of the burden." *Chubb Integrated Sys., Ltd. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 60–61 (D.D.C. 1984).

Civil Rule 33, applicable here through Bankruptcy Rule 7033, sets out the procedures for discovery by interrogatory. The responses to an interrogatory must be "true, explicit, responsive, complete, and candid." *Equal Rights Ctr. v. Post Props., Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007). Civil Rule 34 in turn, applicable here through Bankruptcy Rule 7034, sets out the procedure for document requests: "A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request." Fed. R. Civ. P. 34(b)(2)(E)(i). Should a party not fulfill their discovery duties, the seeking party may move to compel discovery under Civil Rule 37, applicable through Bankruptcy Rule 7037. Here, the parties have moved to compel interrogatory responses and the production of documents under Civil Rule 37(a)(3)(iii)–(iv).

### III.    Discussion

#### a.    *Verizon's Motion to Compel*

The Court granted the Verizon Motion to Compel on the terms and conditions set forth in its May 11, 2021 oral ruling (the "Oral Ruling"). While that portion of the Court's ruling is not subject to the Motion for Reconsideration, the ruling is summarized herein for completeness of this Memorandum Opinion. The Verizon Motion to Compel sought an order requiring Core to fully answer Verizon's interrogatory numbers 1, 3, 18, and 21.

     *i.*     ***Verizon Interrogatory Numbers 1 and 3***

     Interrogatory number 1 requests Core identify what services Core provided for each Invoice item with a dollar amount other than "0.00."[8] Verizon Mot. to Compel at 8, ECF No. 62. Interrogatory number 3 requests Core identify what services Core provided to Verizon for each composite or blended rate item on any Invoice.[9] *Id*. at 9. These inquiries are designed to support Verizon's theory that another entity/entity's equipment provided services, and not Core. *See Advamtel, LLC v. AT&T Corp.*, 118 F.Supp.2d 680, 683–84 (E.D. Va. 2000). The theory follows that if Core did not provide services, then they may not be entitled to bill for such services under their filed tariff. The Court finds this sufficiently related to "the nature of the claims that the parties have asserted" to be within the universe of discoverable information. *See Cobell v. Norton*, 226 F.R.D. 67, 79 (D.D.C. 2005). The "probable effect" on Verizon's defense is sufficient to make the discovery requests relevant and discoverable to the extent that the information is available and under the control of Core. *Smith v. Schlesinger*, 513 F.2d 462, 473 (D.C. Cir. 1975).

     Core argues that information already in Verizon's possession is sufficient to answer interrogatory numbers 1 and 3. *See* Core Commc'ns Inc.'s Opp'n to Mot. to Compel Disc. at 8, ECF No. 64. The Court disagrees. As Core states in its Opposition, "Verizon can compare the amounts Core billed against its own switch records to determine the validity of the amounts and rates billed." *Id*. True, Verizon could, but reverse engineering what services could have been

---

[8] Verizon interrogatory number 1: "For each USAGE Report Line Item for each of the Invoices that includes a dollar amount other than "0.00" in the "AMOUNT" column, state what services were provided by You, identify all equipment used to provide those services by owner, and, where applicable, Common Language Location Identifier ("CLLI Code"). To the extent that Your response to this Interrogatory would be identical for multiple USAGE Report Line Items and/or multiple Invoices, You may respond accordingly."

[9] Verizon interrogatory number 3: "For each rate element identified in response to Interrogatory No. 2, state what services were provided by You, and identify all equipment used to provide those services by owner, and, where applicable, CLLI Code."

performed is not the same as stating which services were performed. To the extent the information exists in Core's possession, Core must provide full and complete responses to interrogatory number 1.

Finally, the Court also disagrees with Core's suggestion that the list of equipment provided, which includes all equipment owned by Core to provide switched access services (the "Core Equipment List") is an adequate response to Verizon's questions. *See id*. at 9. Where Verizon disputes whether the calls they were billed for actually passed through Core's equipment, an equipment list does not establish whether Core used that equipment to provide those services. If information exists in Core's possession which ties Core's charges to Verizon with the services provided and the specific, identifiable equipment, Core must provide such to Verizon in response to interrogatory number 3.

### ii.    *Verizon Interrogatory Numbers 18 and 21*

Interrogatory number 18 requests Core provide Verizon the dollar amounts that Core billed Verizon for services delivered through "a tandem[10] which Core neither owned nor operated."[11] Verizon Mot. to Compel at 14, ECF No. 62–2. Interrogatory number 21 originates from the expert report prepared by Core's expert and asks Core to distinguish when they provided Verizon with

---

[10] A term of art for a switch connecting telecom offices that does not connect to the end-user.

[11] Verizon interrogatory number 18: "In a March 2, 2011 e-mail (attached as Exhibit A hereto), Chris Van de Verg stated:

> In response to your inquiry, it is Core's understanding of the law that a CLEC such as Core is permitted to charge tandem rate elements so long as the IXC or other carrier delivers the traffic to Core through a tandem, regardless of what carrier owns or operates that tandem. So, the actual ownership of each tandem is irrelevant.

Please state for each of the Invoices the total dollar amount Core billed Verizon for tandem rate elements for calls delivered to Core through a tandem that Core neither owned nor operated."

specific "functions" or when they provided services that were a "functional equivalent," as well as

to state whether Core provided those services directly or indirectly.[12] *Id*. Similar to interrogatory

numbers 1 and 3, interrogatory numbers 18 and 21 seek to discover information related to the

details of the services for which Verizon was billed by Core under its tariffs. If Core billed Verizon

for services through third-party tandems or for "equivalent" services, there is an argument that

these services would be outside the scope of Core's tariffs, and thus non-compensable. The Court

finds this both sufficiently related to the nature of the claims that the parties have asserted to be

discoverable and of sufficient probable effect on Verizon's defenses to make the requests relevant.

The Verizon Motion to Compel argues that Core's original responses to interrogatory

numbers 18 and 21 were insufficient. Verizon Mot. to Compel at 16–17, ECF No. 62–2. Core

objects that Verizon's claimed information is not relevant because (i) it does not go to whether the

traffic was compensable and (ii) that it could bill for services regardless of what carrier owns or

operates the tandem. Core Commc'ns Inc.'s Opp'n to Mot. to Compel Disc. at 14, ECF No. 64.

---

[12] Verizon interrogatory number 21: "Paragraphs 28 and 29 of the Roesel Report state:

28. The vast majority of Core's originating switched access service is 8YY origination service (also called Toll Free Interexchange Delivery Service). The functions, or functional equivalents, Core provides (directly or indirectly under the VoIP Symmetry rule) in delivering 8YY calls to IXCs include Tandem Switched Transport - Termination, Tandem Switched Transport - Facility, Tandem Switching, Common Transport Multiplexing, Common Trunk Port, Local (End Office) Switching, and 8YY Query.

29. The functions, or functional equivalents, Core provides in delivering terminating switched access calls from IXCs include Tandem Switched Transport - Termination, Tandem Switched Transport - Facility, Tandem Switching, Common Transport Multiplexing, Common Trunk Port, and Local (End Office) Switching.'

Using the terms "function," "functional equivalent," directly," and "indirectly" as they are used in those paragraphs, please state for each of the listed functions and functional equivalents: (a) whether Core provided a function or functional equivalent; (b) whether Core provided that function or functional equivalent directly or indirectly; (c) what the functional equivalent was that Core provided, what it was the functional equivalent of; (d) who actually performed the functions or functional equivalents that Core provided indirectly, and what did they do to perform it. If the response to this Interrogatory varies by time period, jurisdiction, or invoice, please respond separately for each."

The Court disagrees. The requested information goes to the question as to whether the traffic for which invoices were issued was compensable under the applicable tariff. Core further objects that such granular responses would be burdensome. *See id*. However, Core has not shown that the burden is significantly higher than the value of the information or that the information is so far afield as to be a fishing expedition. To the extent that Core has in its custody or control information to answer the interrogatories, Core must fully answer interrogatory numbers 18 and 21. However, as stated in the Oral Ruling, the Court will not require Core to create a new form of coding or formatting of information other than what already exists to supplement its previous answers.

### b.    Core's Motion to Compel

The Court's Oral Ruling granting each of the requests remaining in Core's Motion to Compel is the subject of Verizon's Motion to Reconsider. As stated *supra*, in the course of preparation of this Memorandum Opinion, the Court has determined that certain portions of its Oral Ruling were based upon an incorrect application of the term "fraud" within the context of this telecommunication dispute. The filed-rate doctrine dictates that in cases dealing with tariffs, the inquiry on a cause of action to enforce the tariff is limited solely to the transactions between the party with the tariff (Core) and the party seeking to enforce the tariff or against who enforcement in sought (Verizon). *See Kan. City S. R. Co. v. Carl*, 227 U.S. 639, 650 (1913) ("when the carrier has filed rate-sheets which show two rates based upon valuation upon a particular class of traffic, that it is legally bound to apply that rate which corresponds to the valuation."); *Old Dominion Elec. Coop. v. PJM Interconnection, LLC*, 24 F.4th 271, 283 (4th Cir. 2022) ("the filed-rate doctrine bars a court from awarding damages that would have the effect of altering the tariffed rate ordinarily paid by the plaintiff. And doing so would disturb the doctrine's dual aims of preventing discrimination among ratepayers and safeguarding the ratemaking authority of federal agencies.");

*Mixon v. Contract Callers, Inc.*, 528 F.Supp.3d 897, 899–900 (N.D. Ill. 2021) (summarizing the history of the filed-rate doctrine); *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000). Unlike a standard contract law case, there are no equitable defenses to a breach of tariff action. *Bryan v. BellSouth Commc'ns*, 377 F.3d 424, 429–30 (4th Cir. 2004). If the legal definition of fraud were applicable herein, issues related to the elements of fraud in including justifiable reliance, would be relevant. However, that is not the issue before the Court.

The question is not whether Core committed legal fraud, but whether the traffic for which Core seeks compensation is either (a) compensable, or (b) of a category deemed noncompensable including that referred to in the telecommunications industry as "fraudulent." The term of art does not require an analysis of the typical legal elements of fraud, including justifiable reliance, but instead a factual analysis of the traffic itself including origination, type, and nature of the calls. Thus, inquiry into what Verizon did with or about such traffic after receipt from Core is not relevant to the breach of tariff claims at issue in the Complaint. The Court's Oral Ruling granted Core's Motion to Compel in full to the extent the information was maintained in a format that can be transmitted and would not have been created to respond to the discovery requests. However, because the Court has determined that "fraud" and "fraudulent" are terms of art within the telecommunications industry that to refer to (generally) robocalls or calls not initiated in a "normal" manner, not those which fall within the legal definition of fraud, relevant discovery is only related to the tariffed charges and traffic. Anything "down-stream," i.e., which occurred after the traffic was received by Verizon, is not relevant in a breach of tariff action and the Saint Report use of the term "fraud" does not modify that relevancy analysis. It is upon this revised legal analysis the Court reviews Core's Motion to Compel.

In applying this standard, the requests in the Core Motion to Compel can be divided into four related groups. First, interrogatory numbers 20, 21, 22, and 23 seek to discover information regarding the analysis, billing, blocking, reporting, or complaints Verizon took with respect to the allegedly "fraudulent" traffic. Second, interrogatory numbers 11, 12, and 13 and request for production 7 seek discovery of information related Verizon's actions as to traffic received from Core after receipt. Third, interrogatory number 16 and requests for production 19 and 23 seek information from intermediary providers for Core originated traffic delivered to Verizon. Finally, requests for production 1 and 6 regarding seek traffic studies performed on Core-Verizon traffic and the Call Detail Records ("CDRs") of Core-Verizon traffic are those which Core argues Verizon's previous production was deficient.

### i.    *Interrogatory Numbers 20, 21, 22, and 23*

Interrogatory number 20 requests information as to whether Verizon attempted to avoid billing customers for the allegedly fraudulent Core originated traffic.[13] Core Mot. to Compel at 13, ECF No. 68. Interrogatory number 22 requests each instance where a Verizon customer complained of the allegedly fraudulent traffic identified by Verizon's expert.[14] *Id*. at 16. Interrogatory number 23 requests any steps that Verizon took to curb the allegedly fraudulent Core originated traffic.[15] *Id*. Core argues that if Verizon knew that some Core-originated traffic was

---

[13] Core interrogatory number 20: "Please describe any actions that Verizon took to avoid billing RespOrgs and other Verizon customers for potentially fraudulent 8YY calls that Verizon received from Core."

[14] Core interrogatory number 22: "Identify each instance in which any RespOrg or other customer of Verizon complained about any of the fraudulent or potentially fraudulent traffic identified in the Saint Report."

[15] Core interrogatory number 23: "Please describe all steps that Verizon took to 1) block traffic coming from Core that fit any of the allegedly non-compensable categories identified by Ms. Saint; 2) file reports to regulatory or law enforcement authorities regarding traffic coming from Core that fit any of the allegedly non-compensable categories identified by Ms. Saint, or 3) complain about any traffic coming from Core that fit any of the allegedly non-compensable categories identified by Ms. Saint"

fraudulent at the time it transmitted that traffic to their customers, it may have been required to abide by the dispute resolution terms in Core's tariff, and their lack of compliance may preclude Verizon from disputing the charges now. *Id*. at 3. However, Core's argument on "what happened down the line"—whether related to billing, blocking, reporting, or complaints—is misplaced in consideration of whether services provided under its tariffs are compensable. The only query is whether the charges issued to Verizon comply with the tariff. *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000). What Verizon did with such traffic under tariffs or contracts with other providers is not relevant to the claim that Verizon owes Core for the services provided nor the defense that the charges issued by Core to Verizon are non-compensable under the terms of Core's filed tariffs. *Id.* Therefore, the Court reverses its previous decision in the Oral Ruling and Core's Motion to Compel as to interrogatory numbers 20, 22, and 23 is denied.

However, interrogatory number 21 requests information as to any analysis conducted by Verizon to compare Core's records with Verizon's records.[16] Core Mot. to Compel at 15, ECF No. 68. The Saint Report provides a summary and significant details regarding the analysis conducted by Ms. Saint with respect to Core's invoiced services, including details and conclusions as to their "fraudulent" nature. *See* Exhibit A, ECF No. 68–3. One of Verizon's primary defenses herein is that the services for which it is being billed are non-compensable for a number of reasons, as supported by the Saint Report. Opp'n at 3–4 n.3, ECF No. 70. Any analysis conducted by Ms. Saint of the Originating Records (as defined in the discovery requests) would clearly be relevant in this matter and is discoverable. As worded, interrogatory number 21 is not limited by time or

---

[16] Core interrogatory number 21: "Identify any analysis by Verizon, whether performed by Ms. Saint or otherwise, comparing the Originating Records to Verizon's own call records (including but not limited to switch records generated by Verizon's own switches), or comparing the Originating Records to switch records generated by any other carrier (including but not limited to any intermediary carrier)."

scope—seeking any analysis at any time comparing Core's Originating Records to both Verizon's records or those of any other carrier, including carriers who received the traffic after Verizon. To the extent the request seeks anything related to "down line" (i.e., post-Verizon) carriers, it is not relevant and the Core Motion to Compel is denied. To the extent the request seeks analysis outside the timeframe of the relevant transactions in this case, it is not relevant and the Core Motion to Compel is denied. However, to the extent there is any analysis of the Originating Records with call or switch records for the traffic during the period of transmission from Core to Verizon, such analysis is relevant and discoverable. As Core's Reply notes, Core is not asking for Verizon to engage in any new analysis of this traffic; Core is only asking for any past analysis of the calls. Core Commc'ns, Inc's Reply Mem. of P & A in Supp. of Mot. to Compel Disc., ECF No. 71. Therefore, Core's Motion to Compel as to interrogatory number 21 is granted, in part, as to any past analysis conducted for traffic as limited herein.

### ii. Interrogatory Numbers 11, 12, and 13 and Request for Production 7

The second category of requests all seek discovery of information related Verizon's actions as to traffic received from Core after receipt. Interrogatory number 11 requests how much compensation Verizon received from 8YY call recipients for Core originated traffic.[17] Core Mot. to Compel at 8, ECF No. 68. Interrogatory number 12 requests the volume of Core originated traffic that Verizon routed to specific 8YY call recipients.[18] *Id*. Interrogatory number 13 requests

---

[17] Core interrogatory number 11: "Since January 2011, how much compensation has Verizon received from RespOrgs and Verizon end-user customers for 8YY calls for which the charge number field in the call flow is populated with an NPA-NXX assigned to Core OCNs?"

[18] Core interrogatory number 12: For each entity listed on Exhibit 1 hereto, state the total volume of telecommunications traffic that Verizon delivered to each entity since January 2011 for which the charge number in the call flow is populated with an NPA-NXX assigned to Core OCNs."

the compensation paid to Verizon for the traffic mentioned in interrogatory number 12.[19] *Id*. at 9.

Request for production 7 requests copies of invoices sent to the same entities as interrogatory

number 12.[20] *Id*. Because each of these requests seeks discovery as to Verizon's actions after

completion of the tariffed traffic between Core and Verizon, they are not relevant to a breach of

tariff analysis as discussed *supra*. Therefore, the Court reverses its previous decision in the Oral

Ruling and Core's Motion to Compel as to interrogatory numbers 11, 12, and 13 and request for

production 7 is denied. Because the Court denies the Motion to Compel on relevance grounds, the

Court does not reach the question of whether Verizon met its evidentiary burden as to the whether

interrogatory numbers 11, 12, and 13 and request for production 7 are unduly burdensome.

### iii.    *Interrogatory Number 16 and Requests for Production 19 and 20*

The third category of requests deal with discovery aimed at intermediary providers for Core

originated traffic delivered to Verizon, including Intrado (one of the intermediaries). Specifically,

interrogatory number 16 requests information as to whether Verizon paid third-party intermediary

providers for Core originated traffic.[21] Core Mot. to Compel at 12, ECF No. 68. Request for

production 19 requests any agreement between Verizon and Intrado for delivery of Core originated

traffic that passed through Intrado.[22] *Id*. Request for production 20 requests records of any payment

---

[19] Core interrogatory number 13: "For each entity listed on Exhibit 1, state the amount of compensation that Verizon has received for 8YY calls for which the charge number field in the call flow is populated with an NPA-NXX assigned to a Core OCN."

[20] Core request for production 7: "Copies of all invoices that Verizon issued to the entities listed on Exhibit 2 attached hereto (subsequently clarified as Exhibit 1)."
[21] Core interrogatory number 16: "Has Verizon paid any third-party tandem provider for telecommunications traffic for which the charge number field in the call flow is populated with an NPA-NXX assigned to a Core OCN? If so, state the amounts paid to each third-party tandem provider"

[22] Core request for production 19: "Provide any agreement between Verizon and Intrado (a/k/a West Telecom, Hybercube) governing delivery any of the traffic recorded in the Originating Records referenced in the Saint Report, or any traffic passed from Core through Intrado to Verizon."

made to Intrado by Verizon of Core originated traffic that passed through Intrado.[23] *Id*. at 13. Verizon alleges that Core purchases calls in bulk from third-party intermediaries and then bills those calls to Verizon, which Verizon alleges is impermissible under Core's tariff and inflates the invoices submitted to Verizon thereunder. Opp'n at 5–6, n.6, ECF No. 70. The discovery in this category again focuses on transactions with those outside the charges to Verizon by Core under its tariffs, and thus Verizon argues they are not relevant to the breach of tariff claims in the Complaint. *Id.* In addition, Verizon objects to interrogatory number 16 additionally as unduly burdensome. *Id*. Verizon represents that the reports and information requested by Core in interrogatory number 16 do not exist and are neither automatically nor easily created. *Id*.

Requests for production 19 seeks any agreement between Verizon and Intrado governing delivery of traffic referenced in the Saint Report and passed from Core through Intrado to Verizon. Core Mot. to Compel at 12, ECF No. 68–2. As this request deals directly to the traffic for which Core is charging Verizon under the tariff and requests existing agreements, not comparisons of records, the Court finds that request for production 19 is relevant. Similarly, request for production 20 seeks records on payments to Intrado for traffic that passed from Core through Intrado to Verizon. *Id*. at 13. While not as clearly specifically relevant, the information may lead to relevant information with respect to the traffic for which Core has invoiced Verizon sufficient to meet the standard of Civil Rule 26(b). Thus, the Court finds requests for production 19 and 20 seek information either relevant or likely to lead to relevant information regarding Core's services and charges to Verizon under its filed tariffs. Therefore, Core's Motion to Compel is granted as to requests for production 19 and 20.

---

[23] Core request for production 20: "Provide any records relating to any payment made by Verizon to Intrado (a/k/a West Telecom, Hybercube) in connection with any of the traffic recorded in the Originating Records referenced in the Saint Report or any traffic passed from Core through Intrado to Verizon."

However, interrogatory number 16 seeks information from Verizon for transactions not between Core and Verizon, but Verizon and third parties. Similar to the analysis above with respect to interrogatory numbers 11, 12, 13, 20, 22, and 23, Verizon's actions with third parties are not relevant to the question of whether there is a breach of Core's filed tariffs by Verizon and Core's Motion to Compel as to interrogatory number 16 is denied. Because the Court denies the Motion to Compel on relevance grounds, the Court does not reach the question of whether Verizon met its evidentiary burden as to the whether interrogatory number 16 is unduly burdensome.

### iv.    Requests for Production 1 and 6

The final category of discovery herein are two requests for production of documents related to the traffic between Verizon and Core. Request for production 1 seeks traffic studies performed by Verizon on traffic flowing from Core to Verizon ("Core-Verizon Traffic").[24] Core Mot. to Compel at 19, ECF No. 68–2. Request for production 6 seeks Call Detail Records ("CDR") for any traffic transmitted between Core and Verizon.[25] *Id*. At the hearing on the Motions to Compel, counsel for Verizon objected to the relief requested as to request for production 1 on the basis that Verizon previously had turned over all responsive documents. In the Oral Ruling, the Court found that such studies met the relevancy standards and granted the Core Motion to Compel as to request for production 1 to the extent there existed any responsive documents not previously disclosed by Verizon. That ruling is adopted herein and the Core Motion to Compel is granted as to request for

---

[24] Core request for production 1: "Copies of any and all traffic studies performed by Verizon, or on Verizon's behalf, related to or regarding telecommunications traffic sent from Core to Verizon, or from Verizon to Core (whether through a third-party tandem provider or otherwise)."

[25] Core request for production 6: "Call Detail Records for any or all telecommunications traffic that was delivered from Core to Verizon or from Verizon to Core (whether through a tandem provider or otherwise) since 2011."

production 1 to the extent there exist any responsive documents not previously produced by Verizon.

With respect to request for production 6, Counsel for Core clarified that the request was seeking call detail records for calls sent from Verizon to Core ("Verizon-Core Traffic") and any independent Verizon documents for Core-Verizon Traffic (i.e., not a redisclosure of information previously disclosed by Core to Verizon). Verizon's objection to the balance of request for production 6 was focused not on relevance, which the information clearly would be, but on the unduly burdensome nature of the request, specifically because the information requested is not kept segregated in the ordinary course of Verizon's business and segregation of information solely related to Core would be extremely onerous. Opp'n at 8–10, ECF No. 70. In its affidavits, Verizon represents that in 2018–2019 it delivered more than one billion calls to Core in Maryland and Pennsylvania, but the CDRs for these calls are intermixed with calls delivered to all other counterparties and it would take up to 100 hours of analysis to recreate a CDR just for Verizon-Core Traffic for one month. *Id.* at 9–10. Nevertheless, Verizon states that it has "continued to explore whether it may be possible to collect CDRs in a less burdensome manner, and, if it can, it will do so." *Id*. at 10.

The Complaint alleges that Verizon has breached the terms of Core's tariff by not paying Core's invoices for services rendered to Verizon, including for traffic delivered to Core's network from Verizon. Verizon argues that but-for the delivery by Verizon to Core of the calls, Core would not have rendered services to Verizon and, therefore, would not have a claim for calls delivered from Verizon to Core. The records for Core's services for which it seeks compensation for calls delivered by Verizon to Core are included in Core's CDRs which it has already produced to Verizon and for which the Court previously ordered Verizon did not need to re-produce to Core.

Upon further consideration of the elements required to prove breach of tariff, the fact that the Core CDRs contain all the relevant charges for which Core seeks compensation from Verizon, and the burden upon Verizon to create records in the format requested by Core, the Court finds that while the information in request for production is relevant, the burden on Verizon to either create or produce such documents outweighs the likely benefit from the production thereof. Therefore, the Core Motion to Dismiss as to request for production 6 is denied, but such denial is without prejudice should Verizon determine a less burdensome manner to produce the requested documents. The parties are further encouraged, but not required, to once again explore if an agreement may be reached of a very limited time scope in which such records could be produced by Verizon to enable a comparison of records.

### IV.    Conclusion

Therefore, for the reasons stated herein, the Motion for Reconsideration is granted to the extent it requested a written memorandum opinion and the remainder is denied as moot. The May Order is vacated, and the relief granted therein is modified on the terms and conditions set forth in this Memorandum Opinion, which replaces and stands as the written determination on the original Motions to Compel. As such, the Court Orders the following:

1.      The Verizon Motion to Compel is GRANTED.

2.      The Core Motion to Compel is DENIED on relevancy grounds as to interrogatory numbers 11, 12, 13, 16, 20, 22, and 23 and request for production 7. The Core Motion to Compel is Denied as unduly burdensome as to request for production 6.

3.      The Core Motion to Compel is GRANTED, in part, as to interrogatory number 21 as it relates to any past analysis conducted for traffic as limited herein.

4.      The Core Motion to Compel is GRANTED as to requests for production 1, 19, and 20 to the extent there exist any responsive documents not previously produced by Verizon.

5.      Upon this Memorandum Opinion becoming a final order, Stay Order shall be vacated, and the parties shall have a period of 30-days thereof to comply with this Memorandum Opinion.

6.      As set forth in the *Order Granting Consent Motion to Vacate Scheduling Order* (ECF No. 92), the parties shall have 14 days after this Memorandum Opinion becoming a final order to submit a proposed amended scheduling order.

[Signed and dated above.]

Service: recipients of electronic notice.